UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| STEVE VAN HORN, on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>PHILIPS NORTH AMERICA, LLC; KONINKLIJKE PHILIPS N.V.; PHILIPS RS NORTH AMERICA, LLC; and DOES 1-100,<br><br>                              Defendants. | Civil Action No. 3:21-cv-526<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiff STEVE VAN HORN ("Plaintiff") brings this Class Action Complaint (hereinafter, the "Action") against PHILIPS NORTH AMERICA, LLC; KONINKLIJKE PHILIPS N.V.; PHILIPS RS NORTH AMERICA, LLC; and DOES 1-100 (hereinafter "Defendants" or "Philips") individually and on behalf of all others similarly situated, and complain and allege as follows upon personal knowledge as to himself and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE CASE

1. Sleep apnea "*is a potentially serious sleep disorder in which breathing repeatedly stops and starts.*"[1] If left untreated, complications include heart problems, Type 2 Diabetes, metabolic syndrome, complications with medication and surgery, liver problems and others.[2]

2. The continuous positive airway pressure (hereinafter "CPAP") machine was invented in 1980 in Sydney, Australia as a means to treat sleep apnea. According to the Mayo Clinic, the CPAP machine "*is the most common and reliable method of treating sleep apnea.*"[3] Today, millions of Americans depend on CPAP machines in order to treat their sleep apnea in an effort to mitigate it's risks of the aforementioned complications.

3. Philips designs, manufactures, produces (and has produced), markets, and retails CPAP machines both domestically and internationally. Millions of Americans depend specifically on Philips' CPAP machines to give them the ability to breathe properly while asleep.

4. On June 14, 2021, Philips began to recall their CPAP machines due to a product defect which caused internal "sound abatement foam" within specific Philips' devices, including

---

[1] "Sleep apnea," MAYO CLINIC (July 28, 2020), at https://www.mayoclinic.org/diseases-conditions/sleep-apnea/symptoms-causes/syc-20377631.
[2] *Id.*
[3] *Id*, at https://www.mayoclinic.org/diseases-conditions/sleep-apnea/diagnosis-treatment/drc-20377636.

their CPAP devices, BiLevel Positive Airway Pressure (hereinafter "BiLevel PAP") devices[4] and other ventilator machines to break off into the device, enter the device's airpath way and be ingested or inhaled by the user (hereinafter the "Defect").[5]

5. The sound abatement foam is made out of polyester-based polyurethane ("PE-PUR") foam. This sound abatement foam, according to Philips, "may off-gas certain chemicals" including volatile organic compounds that may be carcinogenic.[6] Philips announced these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."

6. Specifically, Philips announced the following devices are affected devices by the Defect (hereinafter, the "Affected Products"):

- E30
- DreamStation (ASV)
- DreamStation (ST, AVAPS)
- SystemOne (ASV4)
- C Series
- OmniLab Advanced Plus
- SystemOne (Q Series)
- DreamStation (CPAP, Auto CPAP, BiPAP)
- DreamStation GO (CPAP, APAP)
- Dorma 400, 500 (CPAP)
- REMStar SE Auto (CPAP)
- Trilogy 100 Ventilator
- Trilogy 200 Ventilator
- Garbin Plus, Aeris, Lifevent (Ventilator)

---

[4] A device which also treats sleep apnea which is used alternatively to CPAP machines, has many of the same components of a CPAP machine, and are also produced by the Defendants.

[5] **Ex. A.** "Philips issues recall notification to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory devices," SEC FORM 6-K (June 14, 2021), at https://www.sec.gov/Archives/edgar/data/313216/000031321621000015/phg-20210614.htm.

[6] *Id.*

3

- A-Series BiPAP V30 Auto (Ventilator)

7. Philips knew about the Defect, including the hazardous implications to the health of those who use the Affected Products for several years. Despite its knowledge, Philips failed to warn the public or its customers until late April 2021, and did not recall the Affected Products until June 14, 2021.

8. Plaintiff, individually on behalf of himself and all other similarly situated, brings this Action under federal and state law to demand all damages for the harm caused by the Defendants and their woefully inadequate recall.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which the Plaintiff is a citizen of a state different from Defendants.

10. This Court has personal jurisdiction over Defendants because they transact business in the United States, including in this District, have substantial aggregate contacts with the United States, including in this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed themselves of the laws of the United States and the Commonwealth of Virginia, and further, because the defendants conduct significant business in the Commonwealth of Virginia, receive significant income from the sale of the Affected Products in the Commonwealth of Virginia, market the Affected Products in the Commonwealth, and sold replacement parts and accessories for the subject respiratory device in the Commonwealth of Virginia.

11. In accordance with 28 U.S.C. § 1391, venue is proper in this District because this District is where a substantial part of the conduct giving rise to Plaintiffs' claims occurred, where Defendants transact business, and where one of the Defendants is headquartered.

## PARTIES

12. **Plaintiff.** Plaintiff Steve Van Horn is a resident of the Commonwealth of Virginia. Plaintiff purchased one of the Affected Products. Due to the Defendant's conduct alleged herein, the Plaintiff was harmed economically.

13. **Defendants.** Defendant Phillips North America, LLC, a Delaware corporation, is located in Cambridge, Massachusetts and authorized to transact business in the Commonwealth of Virginia. It is an international health technology company which produces medical devices including the Affected Products enumerated herein. Phillips North America, LLC is the entity responsible for causing the harm alleged in this complaint by way of producing the Affected Products with the aforementioned Defect.

14. Defendant Koninklijke Philips N.V., a Dutch multinational corporation, is the publicly traded parent company to Defendant Philips North America, LLC.

15. Defendant Philips RS North America, LLC, a Delaware corporation, is a subsidiary which is owned by Defendant Koninklijke Philips N.V. and formerly operated under the business name "Respironics."

16. Doe Defendants 1-100 are subsidiaries and/or affiliates of the Defendants that may be responsible for the conduct alleged herein. Such parties are named "Doe Defendants" pending the discovery portion of this case.

## FACTUAL ALLEGATIONS

### A. SLEEP APNEA, THE INVENTION OF THE CPAP MACHINE, AND CPAP MACHINES

17. Sleep apnea affects millions of Americans annually.

18. CPAP machines (as well as the other aforelisted Affected Products), for many, are the solution.

19. It is a solution that they rely on for one of the most basic of human functions: breathing.

20. A CPAP machine "*increases air pressure in [the patient's] throat so that [the patient's] airway doesn't collapse when [the patient inhales.]*"[7] The machine works by generating a constant stream of pressurized air which travels through an air filter and into a flexible tube; then the tube delivers purified air into a mask that is sealed around the patient's nose or mouth.[8]

21. After the CPAP machine was invented in 1980, "Philips Respironics debuted the first suitable system in the United States […] [a]nd a few years later in 1990 came the first self-sealing interface, 'the bubble mask' which took comfort and therapy to the next level."[9]

---

[7] "Continuous Positive Airway Pressure Therapy for Obstructive Sleep Apnea," UNIVERSITY OF MICHIGAN HEALTH – MICHIGAN MEDICINE (Oct. 26, 2020), at https://www.uofmhealth.org/health-library/hw48752.
[8] "What's a CPAP Machine, and How Does It Work," HEALTHLINE, at https://www.healthline.com/health/what-is-a-cpap-machine, (last accessed June 24, 2021).
[9] Reina Patel, "A Quick and Easy Guide to the History of CPAP Therapy," CPAP.com (March 13, 2021), at https://www.cpap.com/blog/the-history-of-cpap-therapy/.

22. The history of CPAP machines is illustrated in the timeline below[10]:



23. Since then, different types of CPAP-like devices have been invented and mass produced – including by the Defendants.

24. The types of devices differ as follows[11]:

- **CPAP device.** This device is programmed to produce pressurized air at one steady air pressure level. To change the air pressure, you have to reset the device's settings.

---

[10] *Id.*
[11] HEALTHLINE, at https://www.healthline.com/health/what-is-a-cpap-machine#different-types.

7

- **APAP (automatic positive airflow pressure) machine.** This kind checks your breathing throughout the night. It automatically adjusts the air pressure to compensate for changes in your sleep position or medications that may have changed your breathing.

- **BiPAP (Bi-level positive airflow pressure).** This device has two pressure settings, one pressure for inhaling and a lower pressure for exhaling. It's used for individuals who can't tolerate CPAP machines or have elevated carbon dioxide levels in their blood. BiPAP devices can also come with a backup respiratory rate for patients who have central sleep apnea. The backup respiratory rate ensures the person breathes, as the main problem with central sleep apnea is initiating breath.

25. Each of these devices work to help patients who need assistance in order to breathe normally while asleep.

26. The Affected Products all fall within the aforementioned categories.

### B. THE DEFENDANTS SOLD KNOWINGLY DEFECTIVE DEVICES WHICH ARE HARMFUL TO CONSUMERS

27. Philips sells millions of the Affected Products which assist consumers with their difficulties breathing while asleep.

28. Consumers pay hundreds (if not thousands) of dollars for the Affected Products and they place their trust in them – for little trust is as sacred as the trust put in a device which helps a consumer breathe air while they are unconscious and asleep.

29. Philips violated that trust by selling the Affected Products with the aforementioned Defect. Namely, that, according to Defendants, "*Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam… Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals.*"[12]

---

[12] **Ex. A,** (emphasis added).

30. Philips did not warn consumers of this risk upon learning of it – even though they knew it existed as early as 2018 through consumer complaints.

31. Philips continued to allow consumers to use these Affected Products which contained the aforementioned Defect even though the Defendants knew about it.

32. Further, Philips continued to sell these Affected Products with the aforementioned Defect into the stream of commerce regardless of the fact that they knew that the Defect existed.

33. Indeed, Defendants states, "*Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects.* **The potential risks of chemical exposure due to off-gassing include** *headache, irritation, hypersensitivity, nausea/vomiting, and possible* **toxic and carcinogenic effects**."[13]

34. Philips continued to profit from the sale of the Affected Products despite knowing that the Defect existed.

35. In fact, Philips profited even more from the sale of the Affected Products than they ordinarily would have due to the use of ventilators during the Novel Coronavirus 2019 pandemic (hereinafter "COVID-19). Ventilators were used in order to keep patients with COVID-19 alive who were struggling to breathe due to COVID-19's horrible effects on the human respiratory system. This amplified the Defendants' sale of the Affected Products beyond a normal functioning market for them – and gave the Defendants further incentive to conceal the truth with respect to the existence of the Defect.

36. And while the Defendants did in fact issue a recall for the Affected Products, it was done only after an extended period of time where they continued to allow these Affected Products to be sold – despite knowing that the Affected Products contained the Defect which is dangerous to consumers who use the Affected Products.

---

[13]   *Id.*

37. Had Plaintiff and the Class members known that the Defect existed, they would not have purchased or continued to use the Affected Products; and, even if the Plaintiff and the Class members did choose to purchase or continue to use the Affected Products with the knowledge of the Defect, they could have assumed the risk for doing so. However, the Defendants denied them the opportunity to do so.

38. Additionally, Plaintiff and the Class members have been harmed because of economic damages flowing from: (1) the loss in value of accessories needed in order to make the Affected Products function (which were not covered by the recall), (2) the necessity for consumers of the Affected Products to go out and buy new devices in order to be able to use them for their ordinary purpose – which is to help them breathe, (3) the cost of medical expenses which might flow from the harm caused by the Defect, and (4) other economic damages that result from receiving an Affected Product with the Defect alleged herein.

### C. PLAINTIFF'S EXPERIENCE WITH THE AFFECTED PRODUCT

39. Plaintiff Steve Vanhorn purchased his Affected Product, a "Dream Station," Reference Number DSX500H11 and "S.N" J1640860900F3 in Virginia Beach, Virginia. Defendants designed, manufactured, and distributed Plaintiff's Affected Product.

40. Plaintiff Vanhorn purchased the Affected Product at the recommendation of his medical provider(s) and has purchased services and supplies for the Affected Product. Plaintiff suffered economic harm as a result of his purchase(s).

### CLASS ACTION ALLEGATIONS

Plaintiff brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of himself and the members of the following class:

> **Class Definition.** All purchasers of the Affected Products in the United States during the statutory period which contain the Defect alleged herein (hereinafter, the "Class").

41. Plaintiff also brings this action individually and as a representative of all those similarly situated on behalf of the following sub-class:

> **Virginia Subclass.** All purchasers of the Affected Products in the United States during the statutory period which contain the Defect alleged herein (hereinafter, the "Sub-Class").

42. Specifically excluded from these definitions are: (1) Defendants, any entity in which a Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the Class definition as necessary.

43. **Numerosity**. The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least thousands of people throughout the Commonwealth of Virginia. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Defendants and their authorized retailers.

44. **Typicality**. The claims of the representative Plaintiff is typical in that Plaintiff, like all Class Members, purchased Affected Products containing the alleged Defect that were designed, manufactured, marketed, advertised, distributed, and sold by Defendants. Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that, inter alia, they have incurred or will continue to incur damage as a result of overpaying for a Product containing the alleged Defect and not fit for its intended use.

45. **Commonality.** Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members

because Defendants have acted on grounds generally applicable to the Class. Such common legal or factual questions include, inter alia:

a) Whether Defendants omitted or failed to disclose material information with respect to the Defect to Plaintiff and the Class;

b) Whether Defendants' conduct violated public policy;

c) Whether Defendants omitted material facts and/or failed to warn reasonable consumers regarding the risks they were aware of that existed with respect to the use of the Affected Products;

d) Whether Defendants engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Affected Products after becoming aware of the Defect alleged herein;

e) Whether Defendants breached the implied warranty of merchantability relating to the Affected Products;

f) Whether Defendants owed a duty to the Plaintiff and the members of the Class;

g) Whether Defendants breached their duty, if any, to the Plaintiff and the members of the Class;

h) Whether Defendants were negligent in its failure to warn;

i) Whether Defendants were negligent in their design of the Affected Products;

j) Whether the Plaintiff and the members of the Class are entitled to damages, including compensatory, exemplary, statutory, and other damages, as well as the amount of such damages;

k) Whether the Plaintiff and the members of the Class have been injured and the proper measure of their injuries as a result of the harm caused by Defendants; and,

l) Whether the Plaintiff and the members of the Class are entitled to injunctive, declaratory, or other equitable relief.

46. **Adequate Representation.** Plaintiff will fairly and adequately protect the interests of Class Members. He has no interests antagonistic to those of Class Members. Plaintiff retained attorneys experienced in the prosecution of complex litigation, including class actions, and Plaintiff intends to prosecute this action vigorously.

47. **Injunctive/Declaratory Relief**. The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and Plaintiff and Class Members will remain at an unreasonable and serious safety risk. Defendants have acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

48. **Predominance and Superiority.** Plaintiff and Class Members have all suffered and will continue to suffer harm and damages because of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

49. Plaintiff knows of no difficulty to be encountered in the maintenance of this Action that would preclude its maintenance as a class action.

50. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

## CAUSES OF ACTION

## COUNT I

### STRICT LIABILITY – FAILURE TO WARN

51. Plaintiff repeats and realleges all previous paragraphs as if fully included and alleged herein.

52. Defendants had a duty to warn the Plaintiff and Class members regarding the Defect contained within the Affected Products and failed to do so when they (the Defendant) became cognizant of the Defect alleged herein.

53. Specifically, Defendants failed to provide the necessary warnings regarding the dangers of inhaling the internal foam of the Affected Products.

54. The Defendants intentionally concealed their knowledge of this danger – even though they had a duty to make it known that this danger existed.

55. As a result, the Plaintiff and the Class members suffered economic harm as a direct and proximate result of the Defendants' conduct.

## COUNT II

### NEGLIGENCE – FAILURE TO WARN

56. Plaintiff repeats and realleges all previous paragraphs as if fully included and alleged herein.

57. Defendants had a duty to warn the Plaintiff and Class members regarding the Defect contained within the Affected Products and failed to do so when they (the Defendant) became cognizant of the Defect alleged herein.

58. Specifically, Defendants failed to provide the necessary warnings regarding the dangers of inhaling the internal foam of the respective machine.

59. The Defendants negligently concealed their knowledge of this danger – even though they had a duty to make it known that this danger existed.

60. As a result, the Plaintiff and the Class members suffered economic harm as a direct and proximate result of the Defendants' conduct.

## COUNT III

### STRICT LIABILITY – DEFECTIVE DESIGN

61. Plaintiff repeats and realleges all previous paragraphs as if fully included and alleged herein.

62. Defendants negligently designed the Recalled Products. Philips owed Plaintiff and the Class members a duty to design the Affected Products in a reasonable manner. The design of the Affected Products, including but not limited to design of the foam and the placement of the foam within the Affected Products, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, and causing headaches, irritation, inflammation, respiratory issues, and exposure to materials.

63. The Affected Products' Defect alleged herein rendered the products not reasonably fit, suitable, or safe for their common and intended purpose.

64. The dangers of the Affected Products' Defect outweighs the benefits the products can provide and renders them unreasonably dangerous.

65. Safer, alternative designs which do not result in the inhalation of the toxic foam exist – as other machines similar to the Affected Products do not contain the Defect alleged herein because they are designed in a more safe manner.

66. The risk/benefit analysis of the Affected Products is unreasonable, and the Affected Products should have had better warnings about the risks that they pose due to the Defect or they should not have been sold at all.

67. The Affected Products did not perform in their common and ordinary manner – which is to help the end-user breathe without being exposed to the risks posed by the Defect.

15

68. As a result, the Plaintiff and Class members suffered economic harm directly and proximately related to the Defendants' conduct.

## COUNT IV

## NEGLIGENT DESIGN

69. Plaintiff repeats and realleges all previous paragraphs as if fully included and alleged herein.

70. Defendants negligently designed the Recalled Products. Philips owed Plaintiff and the Class members a duty to design the Affected Products in a reasonable manner. The design of the Affected Products, including but not limited to design of the foam and the placement of the foam within the Affected Products, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, and causing headaches, irritation, inflammation, respiratory issues, and exposure to materials.

71. The Affected Products' Defect alleged herein rendered the products not reasonably fit, suitable, or safe for their common and intended purpose.

72. The dangers of the Affected Products' Defect outweighs the benefits the products can provide and renders them unreasonably dangerous.

73. Safer, alternative designs which do not result in the inhalation of the toxic foam exist – as other machines similar to the Affected Products do not contain the Defect alleged herein because they are designed in a more safe manner.

74. The risk/benefit analysis of the Affected Products is unreasonable, and the Affected Products should have had better warnings about the risks that they pose due to the Defect or they should not have been sold at all.

75. The Affected Products did not perform in their common and ordinary manner – which is to help the end-user breathe without being exposed to the risks posed by the Defect.

76. As a result, the Plaintiff and Class members suffered economic harm directly and proximately related to the Defendants' conduct.

## COUNT V

**BREACH OF EXPRESS WARRANTY**

77. Plaintiff repeats and realleges all previous paragraphs as if fully included and alleged herein.

78. Defendants expressly warranted the Affected Products, stating that they ""shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

79. This warranty was breached when the Defendants designed, manufactured, and sold into commerce the Affected Products with the Defect alleged herein; this Defect renders the product unusable.

80. If the Plaintiff and Class members knew that the Affected Products were unsafe and were unusable, they would not have purchased them.

81. Defendants refuse to provide appropriate relief with respect to the breach of this warranty.

82. The Plaintiff and Class members were harmed as a direct and proximate cause of the Defendants' conduct.

**COUNT VI**

**BREACH OF IMPLIED WARRANTY**

83. Plaintiff repeats and realleges all previous paragraphs as if fully included and alleged herein.

84. By way of law, Defendants, who designed, manufactured, and distributed the Affected Products into the stream of commerce impliedly warranted that the Affected Products were of merchantable quality and were fit for their ordinary and intended use – which is to help the end-user be able to breathe.

85. The Defendants breached these warranties when they sold the Affected Products into the stream of commerce as a usable product when the Defendants knew that they were not usable due to the Defected alleged herein.

86. The Defendants knew or should have known that the Affected Products contain a defect which could cause deleterious effects to health, which renders the Affected Product as unusable.

87. The recall announcement issued by the Defendants similarly renders the Affected Products useless, as they instruct end-users not to continue to use the product.

88. The Defendants have failed to offer appropriate relief for each of the warranties that they breached in connection with the defective products that they sold.

89. The Plaintiff and Class members were harmed as a direct and proximate cause of the Defendants' conduct.

## COUNT IX

## UNJUST ENRICHMENT

90. Plaintiff repeats and realleges all previous paragraphs as if fully included and alleged herein.

91. Plaintiff and members of the proposed Class conferred substantial benefits on the Defendants with respect to their purchases of the Affected Products.

92. The Defendants knew or should have known that their Affected Products were being sold into commerce with the Defect alleged herein.

93. Thus, it is inequitable for the Defendants to retain the benefits conferred onto them by the Plaintiff and members of the proposed Class.

Plaintiffs and members of the proposed Class are entitled to recover from the Defendants all profits wrongfully collected and improperly retained by the Defendants, including pre- and post-judgment interest.

## PRAYER FOR RELIEF

94. WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court:

> a. Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b. Name Plaintiff as Class Representative and Plaintiff's attorneys as Class Counsel;

    c. Award damages, including compensatory, exemplary, and statutory damages, to Plaintiff and the Class in an amount to be determined at trial, as well as pre- and post- judgment interest;

    d. Grant restitution to Plaintiff and the Class and require Defendants to disgorge its ill-gotten gains;

    e. Permanently enjoin Defendants from engaging in the wrongful and unlawful conduct alleged herein;

    f. Award Plaintiff and the Class their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

    g. Award Plaintiff and the Class pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

    h. Award such further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

95. Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

Dated: August 13, 2021

/s/ Justin M. Sheldon
Jeffrey A. Breit (VSB No. 18876)
Justin M. Sheldon (VSB No. 82632)
Kevin Biniazan (VSB No. 92109)
BREIT CANTOR GRANA BUCKNER, PLLC
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
757.670.3888 Phone
757.670.3939 Facsimile
jeffrey@breitcantor.com
jsheldon@breitcantor.com
kbiniazan@breitcantor.com

*Attorneys for Plaintiff and the Proposed Classes*